1

**BUCKNELL STEHLIK SATO & STUBNER, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144 • fax (206) 587-0277

JUDGE:        Philip H. Brandt
DATE:         October 28, 2008
TIME:         n/a
CHAPTER:      11
LOCATION:  Seattle
RESPONSE DATE:  October 20, 2008

2

3

4

5

6

7

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON, AT SEATTLE

8

In re:

9

LITTLE BOAT, LLC,

10

          Debtor.

11

In re:

12

REDMOND 74, INC.,

13

14

          Debtor.

15

URBAN INNOVATIONS, LLC, et al.,

16

          Plaintiffs,

17

    vs.

18

RAINIER CAPITAL GROUP, LLC, a

19

Washington limited liability company,

20

          Defendant.

21

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Lead Case No. 08-15826
(Administratively Consolidated
With Case No. 08-15825)




ADVERSARY NO. 08-01224




**DECLARATION OF JERRY N.
STEHLIK SUPPORTING
PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO
WITHDRAW REFERENCE**

22

      1.     My name is Jerry N. Stehlik.  I am a partner in the firm of Bucknell Stehlik Sato &

23

Stubner, LLP, located in Seattle, Washington.  My firm is counsel for the plaintiffs in this adversary

24

proceeding.  I provide this declaration to demonstrate to the court the extent and subject matter of

25

26

27

28

Declaration of Jerry N. Stehlik - 1

**BUCKNELL STEHLIK SATO & STUBNER, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144 • fax (206) 587-0277

1    discovery and other related matters that have been occurring in the underlying Chapter 11 case

2    involving the plaintiffs and the defendant in this adversary proceeding, who are the debtors and

3    subordinated secured creditor, respectively, in the Chapter 11 case.

4         2.    The defendant in this case has conducted extensive discovery in the related Chapter

5    11 case. Ostensibly, this discovery is related to two contested motions that the debtors had filed in

6    the bankruptcy case, one is the debtors' motion for post-petition financing, and the other is a motion

7
8    by the debtor Redmond 74, Inc. to approve a sale of property free and clear of liens to Velo

9    Redmond, LLC. On September 30, 2008 defendant served an extensive set of interrogatories and

10   requests for production on the debtors. The defendant also subpoenaed financial and lending records

11
12   from the debtor. The debtor produced over 35,000 pages in response to these discovery requests.

13   On October 14, 2008, defendant took the deposition of two witnesses, one was Daryl Stromswold, a

14   financial officer for the debtors, and the other was Robert Pascal, a vice president of HomeStreet

15   Bank. Again, HomeStreet Bank is the primary secured lender to the debtors and the lender which is

16   providing post-petition financing to the debtors. Referenced deposition pages are attached and

17   incorporated herein.
18

19        3.    The deposition of Mr. Stromswold generated a transcript of 147 pages. The topics

20   covered in that deposition included: the relationship between Redmond 74 and Brian Housley, a

21   principal in Velo Redmond, LLC, the contract purchaser of the 19 lots or "units" to which defendant

22   has objected (Stromswold Dep. at. P. 98-101), a description of the documents produced by the

23
24   debtors consisting of all documents related to negotiations with the bank (HomeStreet) and all other

25   lenders they have talked to and private investors from 2007 through the present, consisting of over

26
27
28   Declaration of Jerry N. Stehlik - 2

BUCKNELL STEHLIK SATO & STUBNER, LLP
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144 • fax (206) 587-0277

W:\CLIENTS\2828\103\stehlik declaration.doc

1   35,000 pages of documents (Stromswold Dep. at p.29 and 141); questions relating to the debtors

2   relationship with HomeStreet Bank, and in particular whether or not the debtors were ever in default

3   with HomeStreet Bank (Stromswold Dep. at p.51); discussion of counsel as to the appropriate scope

4   of the deposition as between Chapter 11 and adversary issues wherein counsel for the defendant

5   stated: "I'll tell you what, there is a little overlap, no denying it." (Stromswold Dep. at p.62); the

6

7   position taken by the defendant in opposition to the proposed sale of lots by Redmond 74, Inc.

8   (Stromswold Dep. at p.90, 106 and 126); and a discussion of the proposed sale to Velo Redmond,

9   LLC (Stromswold Dep. at p.116).  As discussed in plaintiffs' Opposition Memorandum, defendant's

10  refusal to release its lien rights to allow the sale of lots by Redmond 74, Inc. to Velo Redmond, LLC

11

12  is directly at issue in this adversary proceeding.  The defendant has characterized this proposed sale

13  as a "sham" both in its motion and in the Answer and Counterclaims filed in this adversary

14  proceeding.   Unquestionably, the defendant attempted to and succeeded in conducting discovery on

15  this issue in the course of the Stromswold deposition.

16

17          4.      The Robert Pascal deposition generated a transcript of 94 pages.  This deposition

18  extensively explored the lending relationship by and between the debtors and HomeStreet Bank and

19  in a number of places touched on issues in the adversary proceeding.  For example, Mr. Pascal

20  discussed the structure of the financing that was put in place to facilitate the sale of Redmond 74,

21  Inc. property which was thwarted by defendant's refusal to release its lien (Pascal Dep. at p.65 and

22  66).  He also discussed the need of Redmond 74, Inc. to file a bankruptcy proceeding to force

23  defendant to subordinate its lien position to permit construction financing to Little Boat by

24

25  HomeStreet Bank (Pascal Dep. at p.75).  Mr. Pascal also addressed whether the debtors were in

26

27

28  Declaration of Jerry N. Stehlik - 3

BUCKNELL STEHLIK SATO & STUBNER, LLP
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

W:\CLIENTS\2828\103\stehlik declaration.doc

1  default in loans with HomeStreet Bank and whether HomeStreet Bank declared a default (Pascal

2  Dep. at p.11).  The subject matter covered in Mr. Pascal's deposition relates to several issues in this

3  adversary proceeding, including the plaintiffs' claims that the defendant wrongfully refused to

4  subordinate its lien position to allow the sale of Redmond 74, Inc. lots and defendant's justification

5
6  for doing so based upon the alleged default by the plaintiffs under the HomeStreet Bank loans.

7  Defendant alleges in paragraph 3.6 of its counterclaim that "The Rainier Acquisition Financing

8  provided that a default under HomeStreet's A&D Loan was also a default on the Rainier Acquisition

9  Financing", and later in paragraph 3.20 asserted that this "default" justified its refusal to subordinate

10
11  to proposed construction loans by HomeStreet Bank to Little Boat.  Here again, by conducting dis-

12  covery for the ostensible purpose of opposing debtors' motion to approve post-petition financing in

13  the Chapter 11 case defendant has waded into issues in this adversary proceeding.

14      5.      In addition to requesting and seeking documents from the debtors, the defendant also

15  subpoenaed records from HomeStreet Bank.  That subpoena sought "complete copies of all loan

16
17  write-ups, collateral analysis, correspondence and internal memoranda, regarding any loan made by

18  HomeStreet Bank to, or requested by: Little Boat North, Inc., Redmond 74, Inc., Robert Baldwin,

19  Garth Schlemlein, Mark Dean, Will Fernyhough, or any business entity owned or controlled by any

20  of those persons."  Here again, the lending relationship between the plaintiffs, the defendant and

21  HomeStreet Bank are deeply intertwined and the issues upon which the defendants have already

22
23  conducted substantial discovery in the bankruptcy case also touch upon directly and indirectly a

24  number of the issues in this adversary proceeding.

25      //

26

27

28  Declaration of Jerry N. Stehlik - 4

BUCKNELL STEHLIK SATO & STUBNER, LLP
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144 • fax (206) 587-0277

W:\CLIENTS\2828\103\stehlik declaration.doc

1    I declare under penalty of perjury that the foregoing is true and correct.

2    DATED this 20ᵗʰ day of October , 2008.

3

4                                         _____
                                              Jerry N. Stehlik

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

BUCKNELL STEHLIK SATO & STUBNER, LLP
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

28    Declaration of Jerry N. Stehlik - 5

W:\CLIENTS\2828\103\stehlik declaration.doc

Daryl L. Stromswold

```
 1              UNITED STATES BANKRUPTCY COURT
                WESTERN DISTRICT OF WASHINGTON
 2     _____

 3     In re                    )
                                 )
 4     LITTLE BOAT NORTH, INC.   )
       7525 SE 24th STREET, #650 )
 5     MERCER ISLAND, WA 98040,  )  Lead Case No. 08-15826
       Tax ID 20-3046005,        )
 6                               )  (Administratively
                   Debtor.       )   Consolidated with
 7     _____)   Case No. 08-15825)
                                 )
 8     In re                     )
                                 )
 9     REDMOND 74, INC.          )
       7525 SE 24TH STREET, #650 )
10     MERCER ISLAND, WA 98040,  )
       Tax ID 20-5820789,        )
11                               )
                   Debtor.       )
12

13         _____

             DEPOSITION UPON ORAL EXAMINATION
14
                            OF
15
                   DARYL L. STROMSWOLD
16

17         _____
18
19
                 Taken at 1201 Third Avenue
20
                   Seattle, Washington
21
22
23
24     DATE TAKEN:  OCTOBER 14, 2008
25     REPORTED BY:  SHERRILYN SMITH, CCR# 2097
```

National Court Reporters
888.800.9656

Daryl L. Stromswold

1      Q    And, in fact, there were a series of

2    applications made in 2008, right?

3      A    There's a series of ongoing negotiations with

4    the bank, yes.

5      Q    And also a series of ongoing negotiations

6    with potential replacement subordinate capital for

7    Redmond 74, right?

8      A    Yes.

9      Q    Were all of those documents produced as part

10    of the bankruptcy filing, to your knowledge, or just

11    the ultimate last set?

12              MR. KORNFELD:  I'm going to object.

13    When you say "bankruptcy filing," ambiguous.  Are we

14    talking about things filed in the bankruptcy court?

15    Are we talking about the documents that we produced

16    to you last night?

17              MR. WEATHERHEAD:  I guess I don't know.

18    I'll ask that question, too.

19              MR. KORNFELD:  More for clarity than

20    anything else.

21      A    To the best of my knowledge, all the

22    documents we produced to you last night include all

23    the negotiations with the bank and the subordinated

24    debt with lenders we've talked to, the private

25    investors, from late 2007 through now.

National Court Reporters
888.800.9656

Daryl L. Stromswold

Page 51

1           Go ahead.

2       Q    Did you have any idea why HomeStreet Bank was

3   asking you for that?

4       A    It's not unusual for us to give them

5   corporate cash flows or discuss our corporate cash

6   flows with the bank.

7       Q    And HomeStreet Bank is a lender to --

8       A    Yes.

9       Q    To whom?

10      A    HomeStreet Bank is a lender to Little Boat

11  North, Redmond 74, TDC, Falling Water, 305 Lakeside

12  and the founders.  That's all that comes to mind, off

13  the top of my head.

14      Q    And was it your understanding that the

15  request you received from Mr. Pascal for information

16  was in connection with those loans?

17      A    It's in relationship with the ongoing

18  relationship with the bank, yes.

19      Q    Are any of the loans that you just identified

20  in default, to your knowledge?

21      A    I have not received any notices of default.

22      Q    I guess my question is:  Are any of them in

23  default, whether or not you have been notified of a

24  default by the bank, to your knowledge?

25              MR. KORNFELD:  Object to the extent it

Daryl L. Stromswold

1    for the 2007 return, did you have to change any of

2    the assumptions about allocation of cost and overhead

3    to the Bennett sale?

4        A    We reviewed the cost and assumptions and

5    estimates in making the final determinations --

6    profit for the year, yes.

7        Q    And how did you change them as a consequence

8    of that review?

9                MR. KORNFELD:  I'm going to object to

10   this line of questioning.  I've given you a fair

11   amount of room, but we do have an adversarial

12   proceeding filed.  The law is pretty clear that this

13   particular discovery mechanism is not appropriate.  I

14   think you are leading into the adversary proceeding.

15   I'm going to ask you to move on.

16               MR. WEATHERHEAD:  I'll tell you what,

17   there's a little overlap, no denying it.

18               MR. KORNFELD:  Yeah.

19               MR. WEATHERHEAD:  However, you have

20   made some representations about the value of this

21   project and the profitability of the project is

22   intrinsic to that value representation that you have

23   made.  I think I am entitled to inquire whether

24   profit previously taken has now been reallocated to

25   try to thrust it forward to enhance the value of the

National Court Reporters
888.800.9656

Daryl L. Stromswold

Page 90

```
 1    products that were in development when this started
 2    and they have had to come off their price points to
 3    recover their bases.
 4        Q    All right.
 5             And what efforts have you made to sell
 6    product at Redmond 74 or Little Boat North to test
 7    whether that hypothesis holds true; that the land
 8    would stay stable or whether this is one where you
 9    would have to move off your price point?
10        A    We have not.
11        Q    Not at all?
12        A    We cannot because there is no place for
13    vertical construction at Redmond 74.  We cannot
14    obtain financing without the subordination of Rainier
15    Capital, so we have no option to do that at Redmond
16    74.
17             At Little Boat North we have existing
18    inventory that we are trying to sell through and we
19    prefer to sell through that inventory before we try
20    this.
21        Q    All right.
22             You haven't sold any inventory in Little Boat
23    North in how long?
24        A    Probably two months, it could be.
25        Q    Have you adjusted your price points for
```

National Court Reporters
888.800.9656

Electronically signed by Sherrilyn Smith (201-052-843-9094)                                     f8433adb-9d84-4a81-b1ca-26a1908701ab

Daryl L. Stromswold

1    Basically, an update.  People were talking to

2    concepts that were under discussion, possible

3    strategies to sell the projects.

4        Q    All right.

5             And which projects were you talking about?

6        A    Redmond 74, Little Boat North, Jacobson House

7    and Little Duck.

8        Q    And then maybe you can just sort of help me

9    out.  The first one says "Stanton Northwest."

10       A    Yes.

11       Q    Who is Stanton Northwest?

12       A    Stanton Northwest is an entity owned by

13   Brian Housley, and his wife, I believe, is Sheila.

14       Q    And how was Stanton Northwest contacted, if

15   you know?

16       A    My recollection is that Stanton Northwest was

17   contacted through an associate of Mr. Baldwin.

18       Q    Do you know who the associate was?

19       A    Wayne Knowles.

20       Q    And who is Wayne Knowles?

21       A    Wayne Knowles is a person that's been

22   involved in residential and commercial real estate in

23   the Seattle marketplace for a number of years.  He

24   has had prior business dealings with Mr. Baldwin.

25   That's all I know.

National Court Reporters
888.800.9656

Electronically signed by Sherrilyn Smith (201-052-843-9094)                                    f8433adb-9d84-4a81-b1ca-26a1908701ab

Daryl L. Stromswold

1    Q    So is it your understanding that Mr. Baldwin

2    mentioned to Mr. Knowles that he was on the lookout

3    for potential investors and that Mr. Knowles directed

4    him to Mr. Housley?

5    A    That would be my assumption, yes.

6    Q    And prior to this reference, or this

7    referral, I should say, by Mr. Knowles, do you know

8    whether Mr. Housley or any of his entities had any

9    connection with Mr. Baldwin or any of his entities?

10                THE WITNESS:  Can I tell him?

11                MR. KORNFELD:  Yes.

12    A    I'm not aware of any relationship between

13    Urban Innovations and Stanton Northwest.  Mr. Baldwin

14    has stated on a number of occasions that prior to

15    Mr. Knowles making the introduction, he had no

16    relationship with Brian Housley.

17    Q    Okay.

18        And did you have any relationship with Brian

19    Housley?

20    A    No.

21    Q    Ever heard of him before Mr. Knowles referred

22    to him?

23    A    No.

24    Q    All right.

25        Were you privy to any of the discussions

Daryl L. Stromswold

```
 1    between Mr. Baldwin and Mr. Housley?
 2         A    Yes.
 3         Q    And what was discussed?
 4         A    The acquisition of Little Boat North,
 5    Jacobson House and Redmond 74 by Mr. Housley or one
 6    of his entities.
 7         Q    And were there discussions about the terms on
 8    which that might take place?
 9         A    Yes.
10         Q    Tell me about those.
11         A    Basically, it was a buyout, is how we started
12    the discussions.  We wanted Mr. Housley to purchase
13    all three entities.  Mr. Housley was going to go out
14    and arrange the debt financing for himself and
15    acquire the properties.
16         Q    And is that the way it turned out?
17         A    No.
18         Q    Why not?
19         A    A number of factors played into it.
20    Mr. Housley's financial capability to acquire all
21    three projects, his ability to find the financing, he
22    was looking for subordinated debt to help him buy the
23    projects, and eventually we came to terms that worked
24    for both parties.
25         Q    So are you saying that he had insufficient
```

Daryl L. Stromswold

1    credit capacity himself to do the deal through the

2    bank on his own?

3              MR. KORNFELD:  I'm going to object to

4    the extent it calls for speculation.  Daryl may or

5    may not know, obviously, his credit situation.

6        Q   I'm sorry, I'm not asking you to speculate,

7    but I thought you told me that one of the factors was

8    that Mr. Stanton didn't have the financial oomph to

9    do the deal on his own on the terms that you would

10   have originally liked him to.

11       A   I believe the value of all three of these

12   projects was 35- to $45 million of debt.  When

13   Mr. Stanton saw that number, he decided we should

14   renegotiate something else to make this work.

15       Q   So where did it go from then, then?

16       A   I believe we focused on Redmond 74 to start

17   with.  He was looking at acquiring the entire Redmond

18   74 project, which would have contemplated signing up

19   for about a $24 million bank loan commitment.

20       Q   And was that something he would capable of

21   doing, according to him?

22       A   I believe so, yes.

23       Q   And so is that the way the deal went?

24       A   That's the way the deal was documented, yes.

25       Q   And then what happened?

Electronically signed by Sherrilyn Smith (201-052-843-9094)                                                f8433adb-9d84-4a81-b1ca-26a1908701ab

Daryl L. Stromswold

Page 106

1    taken out of the deal, right?   They would have been

2    paid off?

3        A    I believe so, yes.

4        Q    So the proposal currently before the

5    bankruptcy court doesn't have Rainier Capital being

6    paid off, except way down the line, potentially as

7    part of some plan?

8        A    I believe they get periodic payments every

9    time units are taken down.

10       Q    What are those periodic payments, if you

11   know?

12       A    The numbers have changed, but I think

13   currently they are about $16,000 per unit.

14       Q    Is the reason for this bankruptcy that you

15   needed to get Rainier Capital and its loan documents

16   out of the way?

17       A    No, the reason for the bankruptcy is to allow

18   us to go forward with the sale of the project.

19       Q    You said you couldn't build out the project

20   without the bankruptcy?

21       A    No, I said we could not build out the project

22   without obtaining vertical financing on the loans,

23   and Rainier Capital has refused to subordinate the

24   vertical financing.

25       Q    Were there alternatives available to you

Electronically signed by Sherrilyn Smith (201-052-843-9094)                                    f8433adb-9d84-4a81-b1ca-26a1908701ab

Daryl L. Stromswold

1      the marketing name the same as the name of the LLC.

2          Q    And did somebody tell Mr. Housley, you know,

3      we want the -- the buyer ought to have that name,

4      Velo, in it?

5          A    I believe so.

6          Q    Who would that be?

7          A    That would have been Mr. Baldwin or myself.

8          Q    What do you recall about at that, if it was

9      you?

10         A    I probably gave them a marketing brochure or

11     a write-up on it that had the name Velo in it.   It

12     could be that simple, or our attorneys may have

13     contacted Mr. Johnston when they documented the name.

14         Q    Have your attorneys -- and I'm not asking

15     about any communications with your attorneys, I am

16     asking whether your attorneys have prepared any

17     documents related to the formation of Velo Redmond,

18     LLC.

19         A    I have no knowledge of that.

20         Q    Take a look at the second page.

21         A    (Complies.)

22         Q    The third bullet point confirms that under

23     this proposal, Rainier Capital Group would be paid

24     2.9 million, right?

25         A    Yes.

Daryl L. Stromswold

1    this risk to develop the projects to obtain the

2    management fee and not have the profit potential in

3    the real estate, doesn't excite anybody that much.

4        Q    So why did they do it?

5        A    Do what?

6        Q    Why did they position themselves to continue

7    to receive development fees and construction fees

8    without keeping any of the upside for developing?

9            MR. KORNFELD:    I'm assuming you are

10   talking about the Velo deal that's on the table?

11           MR. WEATHERHEAD:    Yes.

12       A    Well, as we have discussed previously, the

13   Velo deal is stalled at this point.  We don't have

14   opportunities to start vertical on the project,

15   because Rainier Capital has stated that they will not

16   fully subordinate to HomeStreet loans -- HomeStreet

17   Bank loans.  This real estate market, you cannot

18   obtain external financing for construction of the

19   project unless that bank is also on the land portion,

20   it's just simply not happening.  You can read any

21   newspaper you want to and you will see how banks are

22   retrenching and trying to dump their real estate.

23           Our only choice for financing for the Velo

24   deal is either through a total outside source and

25   sale of the project or through HomeStreet Bank.

Electronically signed by Sherrilyn Smith (201-052-843-9094)                                        f8433adb-9d84-4a81-b1ca-26a1908701ab

Daryl L. Stromswold

1    name of the firm.

2         Q    Where is he officed?

3         A    Mercer Island.

4              MR. WEATHERHEAD:  If you will give me

5    about five minutes to chat here.  I think we are

6    done.

7              (A brief recess.)

8         Q    Last night we were furnished with a CD-ROM

9    with about 35,000 pages of documents on it.  Are you

10   familiar with what I'm talking about?

11        A    Yeah.

12             MR. KORNFELD:  I'll tell you that it's

13   47,000.

14             MR. WEATHERHEAD:  I only got to 35,000

15   before I got sleepy.

16        Q    Can you tell me what's on that disk?

17        A    I believe there are two major files on it.

18   One is for Redmond, one is for Little Boat North.

19   There were subfiles, one having to do with the

20   acquisition of the property, (inaudible) packages.

21   There could be purchase and sale agreements on that,

22   things of that nature.

23             The other side is a financial drive copied

24   off of our system.  It has all the pro formas that

25   have ever been created for the project, whether they

Robert F. Pascal

```
 1              UNITED STATES BANKRUPTCY COURT
                WESTERN DISTRICT OF WASHINGTON
 2       _____

 3       In re                        )
                                       )
 4       LITTLE BOAT NORTH, INC.       )
         7525 SE 24th STREET, #650     )
 5       MERCER ISLAND, WA 98040,      )  Lead Case No. 08-15826
         Tax ID 20-3046005,            )
 6                                     )  (Administratively
                      Debtor.          )   Consolidated with
 7       _____)   Case No. 08-15825)
                                       )
 8       In re                         )
                                       )
 9       REDMOND 74, INC.              )
         7525 SE 24TH STREET, #650     )
10       MERCER ISLAND, WA 98040,      )
         Tax ID 20-5820789,            )
11                                     )
                      Debtor.          )
12

13       _____

14            DEPOSITION UPON ORAL EXAMINATION

15                         OF

16                   ROBERT F. PASCAL

17       _____
18
19
                 Taken at 1201 Third Avenue
20
                    Seattle, Washington
21
22
23
24       DATE TAKEN:  OCTOBER 14, 2008
25       REPORTED BY:  SHERRILYN SMITH, CCR# 2097
```

National Court Reporters
888.800.9656

Robert F. Pascal

1      Q    And it's also in bankruptcy?

2      A    Yes.

3      Q    Prior to bankruptcy were the loans in

4   default?

5      A    We had not declared a default.  Technically,

6   they may have been in default.  Usually, the key is

7   when we declare a default, but we hadn't declared

8   one.

9      Q    So it's possible that if you had reviewed the

10  file with an eye toward determining whether there was

11  a default, you might have concluded that there was

12  one, but you made a discretionary decision not to do

13  so?

14             MR. CAHN:  Objection.  Calls for

15  speculation.  Misstates prior testimony.

16     Q    You can answer.

17             MR. CAHN:  You can answer.

18     A    Would you say that again?

19     Q    Sure.  Had you made a discretionary decision

20  not to declare a default prior to the bankruptcy?

21     A    We had not -- we had not made any particular

22  decision regarding a default.  It's not my decision

23  to make.

24     Q    Whose decision is it?

25     A    It would typically be an underwriting

National Court Reporters
888.800.9656

Electronically signed by Sherrilyn Smith (201-052-843-9094)                    b10d3b09-58ec-4909-acd5-84683683912c

Robert F. Pascal

1    talk about that you recall as being issues of

2    importance to the bank, without telling me, you know,

3    I told him that our lawyers said this or our lawyers'

4    judgment about the risk was that?

5         It may not be possible to answer the question

6    the way I posed it, but if you can, that's what I'm

7    asking for.

8         A    Our conversations really discussed whether or

9    not there -- you know, legally this was something

10   that would -- that could be done.

11        Q    Okay.

12        Did you talk to Mr. Todhunter or anybody else

13   at the bank about developing a Plan B in the event

14   that Rainier proved to be right, that this was not an

15   arm's length transaction?

16        A    Well, our original plan was to have The

17   Dwelling Company build this on their own with Rainier

18   Capital as a subordinate lender.  That was always the

19   original plan.  Because of the fact that Rainier

20   Capital was in a subordinate position, it would not

21   subordinate and would not take payment of their

22   principal and interest.  We didn't really see an

23   alternative other than selling the land.

24        Q    What caused you to think that Rainier

25   wouldn't accept payment of its principal and

Robert F. Pascal

1    interest?

2         A    Well, maybe I misspoke.  I don't know that

3    we -- we knew that they would not accept payment of

4    principal and interest.  I think it was more that

5    there probably was not room in the transaction to pay

6    everybody; that is, without us assuming an equity

7    position.

8         Q    Or taking a position for future advances

9    subordinate to Rainier Capital?

10        A    Or loaning well outside our normal

11   guidelines.

12        Q    Or requiring the founders to step up and put

13   more equity into the program?

14        A    If they could pay off Rainier, that would be

15   something that could work, but apparently they were

16   unable to do that.

17        Q    Point of fact, didn't you suggest to

18   Mr. Wordstrom --

19                    MR. WEATHERHEAD:  Did I get that right?

20                    MR. KORNFELD:  Stromswold.

21                    MR. WEATHERHEAD:  I knew I said it

22   wrong.

23        Q    Did you suggest to Mr. Stromswold that the

24   bank would make an advance to pay off Rainier

25   Capital, leaving Rainier Capital to await the end of

National Court Reporters
888.800.9656

Robert F. Pascal

1      A    Okay.

2      Q    After approval of the June 6, 2008 request,

3   how did it come up that this interest loan and this

4   attorneys fee loans were going to be necessary to

5   permit the founders to go forward?

6      A    Well, we had issued our commitments in

7   documents on both loans and requested the

8   subordinations be signed and Rainier Capital refused

9   to sign them.

10     Q    And then what?

11     A    Well, then the borrower felt that the only

12  alternative was to either go into state court or go

13  into bankruptcy and get a decision as to whether the

14  project can go forward or not.

15     Q    More specifically, a decision as to whether

16  Rainier was obliged by its documents to subordinate?

17     A    Yes.

18     Q    And without involving any discussions you may

19  have had with your counsel, were you told why the

20  option to go to state court was not taken?

21     A    I -- I can't really answer that without

22  thinking of what our counsel was telling me.

23     Q    Did you talk to Mr. Baldwin about that?

24     A    I'm sure I did.

25     Q    Do you remember what he said about the

Electronically signed by Sherrilyn Smith (201-052-843-9094)                                    b10d3b09-58ec-4909-acd5-84683683912c